Case No. 11-1481 at L. Osburn-Hessey Logistics, LLC Petitioner v. National Labor Relations Board Ms. Bogsy for the petitioner, Mr. Jost for the respondent My name is Micah Jost for the NLRB. I'd like to begin by addressing some of the issues that were raised by opposing counsel. First of all, with regard to Smith's discipline, Mr. Jerry Smith, it's important to recognize that the ALJ not only found that the fear was not reasonable, but in fact his primary finding, the ALJ's primary finding, was that Phil Smith simply did not feel threatened. That is at page 446 of the appendix for that finding. There were numerous reasons that the ALJ made that finding. First of all, contrary to what was noted earlier, the ALJ found that the individuals were about the same size. This is at page 446 of the appendix. Not only were they both about the same size, they were about the same size as a separate individual, Dwight Beard, who had had a confrontation with Manager Phil Smith. And the ALJ found that none of them would qualify for the Tennessee Titans. That's right, Your Honor. A little quip there. But all three of these individuals were about comparable in size. Manager Phil Smith testified that he had not felt intimidated in any way when he had this confrontation with Dwight Beard, who walked right up to him, took off his glasses as if spoiling him for a fight, and called him a damned liar. Under those circumstances, when we compare that to what happened with Jerry Smith, where the individuals were separated by the fence, there was a security guard between them, Jerry Smith was in fact allowed to come back after lunch, which suggests that no one actually thought there would be credible fear here. Under all these circumstances, and of course the fact that Manager Phil Smith was the one who went up to him as if to try to start something himself, under those circumstances there was absolutely nothing to support the claim that Manager Smith felt threatened. And in the alternative, given those same circumstances, the ALJ noted that any such fear would have been completely unreasonable. Along those lines, I also want to note that there was a credibility finding that when Jerry Smith said, both of you, it was understood by everyone that he was referring to Phil Smith and to his girlfriend, Caroline Jones, that he was asking both of them what's the problem. And that's based on the fact that then when Phil Smith came up, he said, according to his own testimony, that anything between Caroline Jones and me is none of your business. So that was, again, him trying to start something. With regard to credibility, I want to note that at the outset of the ALJ's decision at 427, the ALJ notes that he is relying on demeanor throughout. But even where he doesn't get into an extended discussion of demeanor, it's clear that in balancing the testimony of opposing witnesses, he makes his credibility determinations based on numerous surrounding facts, the inherent probabilities. He's relying on a number of considerations. Therefore, those credibility determinations are subject to the same high standard that this Court always applies. With regard to Dotson and his behavior on July 31st, it's clear from the record that everything that he was doing on that day was completely pursuant to the instructions he had received from the company. He had been instructed by Newbery, who was the individual in charge of special labeling. The company admits she was in charge. He had been instructed by her to go get more product so that she could continue to do the work. He had standing instructions from his supervisor, Barbara Oyugi, who was not on the scene at the time. And the standing instructions were that when he's doing replenishments, he's to help other individuals who ask him for help with that task. So when he did the other two replenishments, he was clearly acting within the constraints of what he had been told to do. And at page 438, it's noted that Newbery, in fact, told him to go ahead. She was in charge of the project. He asked, can I go fulfill this replenishment for this other individual? And she told him to proceed with that. With regard to the issue of Bantech and the reasonable investigation, the company is simply wrong as for the law. The case cited in our brief, K&M Electronics, which is in parenthetical is the case that's relied on in Bantech, that case involved an alleged incident that was viewed by a supervisor, witnessed by a supervisor, and the company failed to perform any sort of investigation, in particular by asking the individual at issue, the accused individual, what their side of the story was. The board in that case found that there was essentially a rush to judgment, a sort of railroading of the employee for improper reasons. And that's what we have here as well with regard to both Dotson and Smith, that the failure to talk to witnesses in Smith's case, Cartwright and Jones, and in this case, the failure in particular to talk to Mr. Dotson, who was in a position to give an explanation of what he was doing, the failure to talk to Newberg, all of those circumstances show that there was simply a rush to judgment here. This court's Hastie-Bacon case, which is noted in our brief, but for a different proposition, that provides another example of conduct, alleged conduct that was witnessed by a supervisory individual, in that case a floor monitor, and the failure of the company to take steps to actually investigate or follow up on that demonstrated that there was the same rush to judgment. So both K&M Electronics and Hastie-Bacon show that the company's claim is contrary to the law. With regard to the supposed offenses that Dotson is claimed to have committed on August 20 and August 26, which the company claims were sort of part of a chain of purported disruptive behavior, the ALJ discredited claims that he, in fact, engaged in any kind of insubordination on those two occasions, and there is no basis for reversing those credibility determinations. Those are both at page 439 of the appendix. As for the pre-shift meeting on August 28, I believe the testimony was that he left to go to the bathroom before the meeting had started. There was no disruption of the actual meeting. And the ALJ did not discredit his claim, his testimony that he needed desperately to go to the bathroom. It was simply found that he didn't have an opportunity to explain that to the company at the time that he was discharged. Since there's a few more minutes remaining, I want to note a couple of legal flaws in the other arguments that the company has made with regard to provocation in particular. The company has claimed with regard to Ms. Jones and the fact that she was provoked. The company claims that the issues here are that the doctrine the board is relying on is somehow unbounded or improperly applied in this case, but the cases that we cite in our brief are clearly to the contrary, in particular Steiner Film, which is a First Circuit decision. In that case, the court noted that there are limits, that in fact this is a matter of balancing. You look at the nature of the provocation and the nature of the response, and that's even more clearly defined in the E.I. DuPont board decision that we cite. In that case, the board not only applies the same balancing test that the ALJ applied in this case, but in a footnote, I believe it's the third footnote, the board notes that it's drawing on longstanding principles which emerge from picket line misconduct cases, where the board has always balanced the nature of the provocation against the nature of the reaction. So the claim that this was in any way a departure from precedent is completely unwarranted. With regard to the claims of a loss of jobs, a threat of a loss of jobs, which is a threat that was made by Manager Young, the company tries to rely on an employer's right to state laid law in some form, and the rights of strikers, but it omits to mention that the credited testimony was that she in fact told employees that a lot of them would lose their jobs. It's that statement that she failed to properly explain or walk back in any meaningful way by then saying, well, the company will have some leeway as to whether or not to rehire you. That didn't make her initial statement that a lot of you will lose your jobs any less threatening. And further with regard to the benefits and the threats that Manager Smith made about the gain shares, I want to note first of all that the company doesn't offer any sort of defense in its briefs to the statements that he was actually found to have made, specifically in July when he threatened Jerry Smith and said, you don't know what you're risking. You could lose your gain shares if the union comes in. The company simply doesn't try to defend that. Furthermore, the company doesn't try to defend the credited testimony that he said that employees were absolutely not eligible, or the company doesn't even mention the fact that he threatened other benefits. He threatened meals and apparel that employees enjoyed at the time, said that they would not have those. As for the unlawfulness of the statements that he made at the meeting, even what the company admits he said, which is that employees under a collective bargaining unit would not be entitled to participate in the gain shares, the cases we cite, Niagara Wires and the Melville Confections case from the Seventh Circuit, those cases say that the exact words that he used are a per se violation of the Act. That's well established. It's completely separate from whether or not there was an unlawful policy, which we acknowledge wasn't alleged that the policy itself was unlawful. But in the Melville Confections case, the crux of the violation was publicizing that policy. Even outside the 10-B period, continuing to publicize and communicate and bring to the attention of employees an unlawful policy is itself unlawful. Finally, with regard to confiscation, we want to note that we're simply relying on public aviation, and the coercive nature of the statements that Manager Smith made to Mark Yelverton when he yelled, not in my warehouse, and tore up the papers, which demonstrated that he was not concerned about cleaning up the break room. He was concerned about his intention was to deprive employees of their rights. So based on those points, unless the Court has any questions, we would ask the Court to enforce the Fourth Order in full.  We'll give you two minutes for rebuttal. Your Honor, I'm going to start with the provocation point. And I didn't address this in my opening, but it relates to Carolyn Jones' conduct in a meeting with management. Carolyn Jones admitted that she called her manager, Jim Windage, a lying sack of crap in a meeting that was to discuss an incident at a security line. And she disagreed with OHL's assessment of what she had done at the security line. She thought she was being disciplined unfairly. But that doesn't excuse her calling her manager a lying sack of crap. And this concept that there has to be a balancing of the provocation with the nature of the provocation balanced with the nature of the response, there was no such balancing done by the NLRB or the ALJ in the decision. So if there is such a balancing that needs to be done, we submit it wasn't done in this case. And we submit that if you did the balancing, calling your manager a lying sack of crap is not the appropriate response, even if you think you're being disciplined unfairly. So also with respect to the opposing counsel referenced the insubordination on August 20th for Rinald Dodson and said that that was discredited. What was discredited was that Rinald Dodson was ever given a written warning based on that insubordination, not that he had actually been doing work that he wasn't supposed to be doing contrary to his assignment. So the underlying facts were not discredited. The fact that he was given a written warning was what was discredited. In terms of one last point, there's a lot of discussion of rush to judgment in this case. You heard rush to judgment. Respectfully, even if you find that there were flaws in the way that OHL investigated these incidents, there's no indication that that had anything to do with the union support of Mr. Dodson or Mr. Smith. And there was no explicit finding that there was a connection between the two. And so we would submit that, you know, it's really kind of beside the point because the point is that there's no evidence connecting the discipline to any anti-union acts. For those reasons, we ask that you grant the petition for review. Okay. Thank you to both sides for the argument. The case is submitted.
judges: Kavanaugh, Srinivasan, Randolph